W. S. FORBES AND J. R. COLE, TRADING AS GLENN COMMISSION COMPANY, v. DREXEL KNITTING MILL COMPANY.

(Filed 31 January, 1928.)

**1. Contracts—Requisites and Validity—Acceptance.**

A written contract for the purchase of certain yarns by the authorized officer of a manufacturing company containing a provision that if the yarn did not come up to specifications it was to be returned to the plaintiffs, agents of the seller, acting upon commission, who were then to supply yarn that met the requirements of the contract, will be upheld by the courts when it is made to appear that no fraud was practiced in its pro-

curement, and that the one who executed the contract for the purchaser could have read and understood its terms and was afforded an opportunity to do so, but executed the contract without reading it.

**2. Contracts—Actions for Breach.**

Where the purchaser of yarns has violated its contract without legal excuse, by refusing to accept certain shipments because of inferiority of grade, instead of requiring the seller to supply other yarns that came up to the requirements of his contract, and has notwithstanding, used the yarns supplied, it is liable for the contract price, in the seller's action to recover it.

APPEAL by defendant from *McElroy, J.,* and a jury, at June Term, 1927, of BURKE. No error.

The first cause of action is brought by plaintiffs against defendant to recover the price of certain yarns, under contract of 13 November, 1924: "The Glenn Commission Co., of Richmond, Va., sells and Drexel Knitting Mill Co., Drexel, N. C., buys the following yarn subject to terms, quality as specified and upon conditions agreed to—no oral statements are binding—40,000 lbs. count 15/1 price 45½ put in cones. Yarn sold: *Sulphur black and white mock twist as spun by Union Mfg. Co.* Shipped January through August, 1925, or as near as possible to such time." Sec. 5. *"The quality of the yarn sold shall be equal to the average running quality of the manufacturer, with no other warranty. No inferiority in quality shall constitute cause for change of terms, conditions or cancellation of any part of contract. In case of such inferiority, the yarn received shall not be used or converted, and buyer agrees to be responsible for said yarn until delivered to carrier at seller's request, and the seller must replace with equal quantity of the grade sold, unless otherwise mutually adjusted. If said yarn is used all complaint shall be deemed waived."*

It is alleged by plaintiffs that after certain shipments of the yarn had been made under the contract, accepted and used, about 19 February, 1925, in violation of the terms of the contract, defendant undertook to cancel same and refused to comply with the contract and receive any further deliveries, contending the yarn was of "inferior quality"; plaintiff protesting, ready, able and willing, and offering to fulfil their part of the contract.

At the time of the refusal of defendant to comply with the contract, "plaintiffs had shipped 8,122 pounds of yarn in six several shipments, beginning on 27 December, 1924, and ending on 5 February, 1925, all of which had been accepted, used and paid for (except the last shipment) without objection or exception, and another shipment was on the way, having been shipped from Union Point, Georgia, prior to notice of the attempted cancellation of the contract by defendant."

Plaintiff prays damages for $50.92 returned yarns and freight charges. Damages sustained on remaining 31,878 lbs. of yarn contracted for $544.77, and amount due plaintiffs, yarn received and wrongfully deducted, $59.63.

For a second cause of action: Certain cotton yarn "to be manufactured by the Jennings Cotton Mill, and pursuant to the terms of said contract the plaintiffs did sell and deliver to the defendant a large quantity of cotton yarn which was received, accepted and used by the defendant. That two invoices of said yarn so delivered to and accepted and used by the said defendant and of the value of $755.25, and for which the defendant contracted and agreed to pay said sum it has refused and declined to pay and is indebted to the plaintiffs in said sum," the total damages claimed being $1,410.57.

The plaintiffs are in the business of selling cotton yarns in Richmond, Va., and the contract is accepted as made at Richmond, Va. The defendant's place of business is Drexel, N. C. The yarn, under the first cause of action, was shipped from Union Manufacturing Co., Union Point, Ga.

The defendant alleges actionable fraud in procuring the contract to be signed. That the type of hosiery yarn contracted for was known to the hosiery trade as "sulphur black and white mock twist." That the yarn shipped was an *inferior grade*. Defendant admits owing the plaintiffs $755.25, under the second cause of action, but held the amount on account of damages owing defendant from plaintiffs for the alleged actionable fraud practiced on it arising out of the first contract in first cause of action. Defendant sets up counterclaims for damage.

At the trial the record discloses the following: "At the close of the defendant's testimony the plaintiffs moved for judgment as of nonsuit upon the two counterclaims pleaded in the answer, that is to say, the claim of $1,800 asserted in paragraph four, of the further answer of the defendant, on account of the fact that the 8,000 (8,122) pounds of yarn accepted and used by the defendant was worth twenty cents per pound, instead of forty-five cents per pound, also as against the counterclaim of $780 for breach of the contract in failing to deliver 31,878 pounds of yarn, same being the balance remaining undelivered of the 40,000 pounds contracted to be delivered, action sustained, and defendant excepted. At the close of the evidence in the case, and after the court had sustained the plaintiffs' motion for judgment as of nonsuit, as to the causes of action set up in the defendant's counterclaim, the plaintiff states in open court that they waive any right to recover any amount set up in the complaint in this action, except as to the sum of $755.35, which he alleges is due them for yarn shipped to the defendant company, manufactured by Jennings Cotton Mill, with interest from 30 July,

1925. And this amount, except as to the interest, the defendant admits would be due the plaintiff, but for the matters set up by way of defense and counterclaim in its answer. The court, being of the opinion that under the pleadings and evidence in the case, that the plaintiff is entitled to recover this amount, notwithstanding the fact that there may have been fraud in securing the execution of the contract for the shipment of the yarn from the Union Manufacturing Company, declined to submit any issue except as to the indebtedness of the defendant to the plaintiff as to the Jennings contract. To this ruling of the court the defendant excepts. The defendant having agreed that if the plaintiffs are entitled to recover in this amount, that said amount should bear interest from 30 July, 1925. The court thereupon orders that judgment be entered against the defendant for the said sum of $755.25, with interest thereon from 30 July, 1925."

The necessary facts will be set forth in the opinion.

*S. J. Ervin and S. J. Ervin, Jr., for plaintiffs.*
*Spainhour & Mull for defendant.*

CLARKSON, J. The plaintiffs, who are in the business of selling cotton yarns, live in Richmond, Va. The defendant's place of business is in Drexel, N. C., and the yarn, the subject of the controversy, was shipped by order of plaintiffs to defendant under the contract from Union Manufacturing Co., Union Point, Ga., to defendant at Drexel, N. C.

It is not denied that under the contract plaintiff had shipped to defendant 8,122 pounds of the 40,000 pounds contracted for, in six shipments, and defendant accepted, used and paid for same, and then stopped shipments on the ground that the yarn was an inferior quality. That defendant contends it purchased a good grade under the contract, well known to the hosiery trade as *sulphur black and white mock twist,* manufactured especially for and extensively used in the knitting mill trade. The defendant sets up actionable fraud in procuring the contract and alleges damages. This action is governed by the terms of the contract, which is in writing.

In *Colt v. Kimball,* 190 N. C., at p. 172-3, *Varser, J.,* speaking for the Court, citing a wealth of authorities, said: "Defendant's testimony shows that he is a man of education and prominence, accustomed to the transaction of business, and of much experience, with more than an average education, who has served on the board of education for Vance County for many years. It was his duty, unless fraudulently prevented therefrom, to read the contract, or, in case he was not able to read the fine print without stronger glasses, to have it read to him. This rule

does not tend to impeach that valuable principle which commands us to treat each other as of good character, but rather enforces along with it the salutary principle that each one must 'mind his own business' and exercise due diligence to know what he is doing. Having executed the contract, and no fraud appearing in the procurement of the execution, the Court is without power to relieve the defendant on the ground that he thought it contained provisions which it does not. He is concluded thereby to the same extent as if he had known what due diligence would have informed him of, to wit, its plain provisions that the agent had no authority to make agreements other than those contained therein, and that such agreements, if made, were not a part of the contract." *Furst v. Merritt,* 190 N. C., 397; *Dunbar v. Tobacco Growers,* 190 N. C., 608; *Hoggard v. Brown,* 192 N. C., 494; *Finance Co. v. McGaskill,* 192 N. C., 557. It will be noted that the language of the opinion is, *"It was his duty, unless fraudulently prevented therefrom, to read the contract."*

R. O. Huffman testified for the defendant that he lived in Morganton, and was secretary and treasurer of the defendant company, located at Drexel. Accompanying the contract was a letter: "Confirming a telephone conversation with Mr. Huffman, and enclosed our contract number . . . for a certain quantity of yarn, sulphur black and white (mock) twist at such and such a price. That is the substance of the letter. Those figures and prices correspond with the contract that was attached to the letter. . . . I signed one copy and returned one copy." On cross-examination: "I am frank to say that I did not read the contract. I am a college graduate and can read. . . . I knew that they made this contract with me and agreed to sell this yarn to me at a certain price, and that they had another contract with the Union Mills in order to get it, and I knew that they had entered into a contract and agreed to pay for it. . . . My recollection is that we used every shipment that we took out of the depot. That one we did not take out of the depot I guess they paid the freight on it back. I think it was returned. *We used the yarn after we discovered the inferiority in the yarn, and knew that it was inferior when we used it.* . . . No, sir, I did not notice that stipulation in there until we were sued, that we were not to use the yarn if it was inferior. . . . The contract says that this yarn that we contracted for was sulphur black and white mock twist, 15 single, the average run of the mill of the Union Manufacturing Company. I read that much of it."

It is not denied by defendant that under the contract 8,122 pounds, in six several shipments, had been made by plaintiffs to defendant, used and paid for by defendant. This action is bottomed on the contract, and the defendant is bound by its terms: *"If said yarn is used all complaint shall be deemed waived."* Then again, *"No inferiority in quality shall*

*constitute cause for change of terms, conditions or cancellation of any part of the contract."* The contract further provides if the yarn is inferior, the seller must replace with equal quantity of the grade sold, and the yarn received shall not be used or converted and the buyer agrees to be responsible for yarn until delivered to carrier at seller's request.

The terms were violated by defendant. The defendant's agent is a college graduate and signed the contract. The high position he occupied with defendant company indicated that he was a man of business capacity, with his "eyes wide open," defendant's agent signed the contract—no trick, artifice or contrivance is shown. He was not lulled into security or thrown off his guard. He said: "I signed one copy and returned one copy." "I am frank to say I did not read the contract." There is no evidence of fraud in the procurement of the execution of the contract.

There are certain exceptions to the general rule not applicable here. See *Oil and Grease Co. v. Averett,* 192 N. C., 465; *Butler v. Fertilizer Works,* 193 N. C., 632.

It may be, from defendant's evidence, a hard contract, but courts are called upon only to construe and not make contracts. If the contract is a hard one, it is the fault of the makers, but all are bound by the terms.

"In *Lea v. Johnson,* 31 N. C., 19, *Pearson, J.,* said: 'Hard cases are the quicksands of the law.' In other words, a judge sometimes looks so much at the apparent hardship of the case as to overlook the law." *Leak v. Armfield,* 187 N. C., at p. 628.

For the reasons given, we find in the judgment below

No error.